Let me just say, in the case of Petit, we are aware, and we thought about it, that the Supreme Court will be deciding this one way or the other, but we thought that since we had brought in a judge from another city, we might as well hear you get ourselves into this and then obviously wait for the Supreme Court. We are disappointed that neither of you brought to our attention the fact that this very issue was before the Supreme Court, had been argued before the Supreme Court, and yet neither of you called that to our attention. One of our colleagues, or the law clerk is one of his colleagues, we don't know who gets it, so I ask her to stand up, thank you. So, and we are disappointed. We do expect counsel to keep abreast of what's going on in the Supreme Court. We can't expect you to do that in all the cases, in all the circuit courts, just ours and the Supreme Court. Having said that, we're now off the record, so we'll go on the record. Okay, we will now hear argument in Petit versus Asbury Park Police Department. Before I start, I'd like to reserve five minutes for rebuttal. Okay, that's a big amount of your time. I don't think I'm going to be very long. That's all right. Okay. It's your time, you can do it. Great. May it please the Court, my name is David Jarachow, and I represent the appellate Tanya Petit. A complaining witness whose false grand jury testimony results in the issuance of an indictment is essentially the same as the function performed by one who falsely swears out an affidavit that results in the issuance of an arrest warrant. In both situations, the complaining witness has initiated a criminal prosecution subjecting the target of his or her efforts to the loss of liberty and other injuries. Accordingly, such a complaining witness is not entitled to absolute immunity arising from the false statements made by his or her grand jury testimony. In this case, there is little question that the complaining witness is Scott Samas, a detective from the Monmouth County Prosecutor's Office. Detective Samas led an undercover investigation and testified at the grand jury hearing, which led to the testimony that he gave to the grand jury. Yes, Judge. To begin with, he misidentified my client, mistook or intentionally mistook my client as her 17-year-old daughter. But that was corrected later in his grand jury testimony. It was not really corrected. It was, he said, oh, oh that's right, it's Tashima, not Tanya, but that he, again, twice afterwards. The prosecutor tried to correct him, but he didn't follow his lead. And even at the very end when the grand jurors were allowed to ask questions, it was not fully clarified. Now, we didn't depose, we never got to the point of deposing Detective Samas, but, you know, based on the response from, on appeal, I think that the answer is that that was a mistake. He misidentified her. Misidentified her as his daughter. Maybe he didn't clarify that. What was the other false testimony? Well, just, if you'll just allow me, the direct quote is, Tanya Petit had drugs on her person. That's in the record. That is in the grand jury transcript. Is the complaint that these are deliberate, knowing falsehoods? Yes, Judge. Yes? Yes. This, it is our position that this detective would say anything to secure an indictment against my client. Well, that's, that's an editorialization. The answer to your question, I think, I think with the daughter, I think there could have been a bona fide mistake, but I don't think that there were, you know, I think one of the issues that we want to get across is that there should be some consequence that, that, you know, Mallie said, you should get it right. You should think twice before you swear out that affidavit. The bona fide mistake is not a, is not a knowing falsehood. Well, that's, that's, that's the first part is the misidentification of the mixing the daughter up with, with the mother. But I say to you that the Mallie, the standard is, well, you should think twice. A complaining witness should think twice before submitting and swearing out an affidavit. So if this officer, if this law enforcement officer is mixing up the daughter and the mother, which leads to her incarceration for six months, that's not really thinking twice. That's not taking a good hard look at your case before going in without a, without cross-examination, without a presiding judge in front of a grand jury. So that's the, that's the first one. The second is that Detective Samas said in front of the grand jury that Miss Petit was a lookout and seller of drugs for the target of the investigation. Again, no, this was not a mistake. This was false. There's no basis. There's nothing in the record that suggests in any way that prior to that day, she was the target of, of any kind of drug operation that she was affiliated with the target of this undercover investigation at all. This is just, say, say what you have to say. There was a confidential informant who provided that information. There was no, there was no, there's no record anywhere of any confidential informant talking about Tanya Petit until after the fact, until after the lawsuit. And then, despite obtaining consent to search the house in question from the principal renter who happened to be Tanya Petit's great aunt, and actually indicating at the grand jury that there was a separate owner, separate owner and separate principal renter, my client's great aunt. Detective Samas falsely testified that my client's husband, and essentially my client as well, were the owners of the house in question, to bolster the case against them. It was a constructive possession theory. And if Tanya Petit and Eugene Petit are the principal renters, they're the ones who are responsible for running the show. And so if drugs are found in the house, even though there was none found in their bedroom, that bolsters the case for the prosecution. So under, you know. Were there, were there drugs found in the house, albeit not in the bedroom? Lots of drugs. Huh? Lots of drugs. Albeit not in the bedroom. Not in their bedroom, and, and, Your Honor. What did he testify to then about those drugs? That, that my client, that my client's husband, and they're married, my client's husband, and by. All right, yeah. That they, that they, they were the principal renters of the house. And they weren't? No, they were guests. They were guests of the aunt. They pulled up, after this drug bust went down, having gone shopping, and they were arrested because they live at the house, constructive possession theory. She was frisked, no contraband found on her or in her purse. And your claim is that this was a deliberate falsehood? The testimony was a deliberate falsehood to secure an indictment, absolutely. I'm saying, that's our contention, Judge. That's our absolute contention. I mean, this is a 1983 action. Yes. And I haven't, the amended complaint would describe this as a, as a knowing falsehood. I mean, is that the, if that one appears in the pleading? No, I don't know if it says knowing falsehood. It's a false testimony. A deliberate falsehood. Well, that's our contention, is that it's knowing. I understand. All right. And Judge Pollack is asking you, what is the language in the complaint? The complaint is that Detective Samus gave false testimony about the items that I mentioned. Does the complaint also suggest that it was deliberate? Knowing. It doesn't specify that. No, I don't believe so. You think that affects the degree of immunity, if any? Or the degree of culpability on the part of the defendant? I do. Yes. And if I had to do over again, I probably should have put in knowing. But the truth is, I think that, well. I was assumed by the district court, at least, that this was a deliberate falsehood, and there's still immunity for the grand jury testimony. Well, the district judge found, I mean, even my, my adversary in the, at the district court level, we both argued that it's qualified immunity for Detective Samus. The judge extrapolated absolute immunity, which I didn't even know about that until, until that was. Didn't know that there was such a thing as. I know there's absolute immunity for the prosecutor, but I'm saying, I also know about the other cases which say that there's a carve out if you're an investigator. Even a prosecutor who investigates could be subject to a suit if they, in the investigative role, not as the advocate. That I knew. How could this be qualified immunity? How could it be qualified immunity? If it's not absolute immunity, then this. It must be qualified. Right there. Well, not must be, but this complaint, I think we, I don't know what counsel can say, but I'm saying I think we can agree that Detective Samus fits the quintessential definition of complaining witness. So, you know, I believe he's entitled to qualified immunity. That's, I think that's, you know, that's my reading of, of the case law. So, then the standard is a reasonable law enforcement officer, which provides. That is one who has a qualified immunity to give false testimony? It's qualified immunity based on a reasonable law enforcement officer's standards. So you would argue that he's not entitled to qualified immunity. At best, at best, this case is a qualified immunity case, and you would argue that it doesn't rise to that level. He can't meet the threshold for qualified immunity. That's correct. All right. Sorry if I, sorry if I'm misunderstanding your questions. My kids complain about that, too. And my wife. Well, go ahead, kid. No, I, I'm afraid I'm, perhaps misunderstood. That's my time. Okay, thank you. So, so, I'm not sure what I'm, well, you have the rebuttal coming, yeah, okay. May it please the court, Michael C. Walters, Deputy Attorney General, on behalf of Appellee Detective Scott Samus. I will, I will begin by addressing how this matter is materially distinguishable from the case in Rayburn. Push that microphone up a little closer. Is that better, your honor? Thank you. I don't think it's that. See if it'll stay up. There you go. I will begin by addressing how this matter is materially distinguishable from Rayburg. In Rayburg, Plaintiff's 1983 claim was based on malicious prosecution. Plaintiff's argument in Rayburg focuses upon the absence of absolute immunity at action based on malicious prosecution. Here, the amended complaint does not set forth a 1983 action based on malicious prosecution. Rather, count to alleges stopping and detaining without probable cause, false arrest, illegal search, false imprisonment, and the denial of various rights. In fact, the term malicious prosecution is not set forth anywhere in the amended complaint. And it's also telling that the district court's opinion did not contain any analysis with regard to a malicious prosecution claim. Because the amended complaint does not allege a 1983 claim based upon malicious prosecution, even if the Supreme Court were to agree with Petitioner's argument in Rayburg, the district court's decision with regard to absolute immunity for grand jury testimony should be affirmed. Furthermore, should be affirmed on other grounds or should be affirmed on absolute immunity because in Rayburg, they're saying they're carving out an exception for absolute immunity only based on malicious prosecution because their argument is at common law. What constitutional right of the plaintiff is violated by a complaining witnesses deliberately false testimony to a grand jury? This circuit has recognized that there is a Fourth Amendment violation based on malicious prosecution. But you said malicious prosecution is not in this case. But that's not. So if malicious prosecution is not alleged, then what constitutional violation occurs? Are we talking Fourth Amendment here still? False arrest? They did include a false arrest claim under the Fourth Amendment. And the judge found on summary judgment that probable cause did exist to arrest and search the appellant. And that portion of the district court's opinion has not been appealed. So grand jury testimony leads to an indictment. Yes. And if the testimony is deliberately false to the grand jury, there could be a malicious prosecution claim. Is that what you're saying? There could be a malicious prosecution claim regardless of whether the individual testifies before the grand jury. So here what we- I'm just trying to figure out what constitutional tort or peg do we hang onto when we're talking about deliberately false testimony and there is no malicious prosecution claim. There would be no constitutional tort in that instance. That is correct. At common law, they distinguish between the tort of defamation and malicious prosecution. However, absolute immunity was applied in the case of a defamation claim, and they did not distinguish between complaining witness or a lay witness, whereas the opposite held true with respect to a malicious prosecution claim at common law. In the event that this court were to find that an appellant has alleged a 1983 claim based upon malicious prosecution and the Supreme Court agrees with Petitioner's argument in Rayburg, Detective Samus is still entitled to qualified immunity. One of the prima facie elements of a malicious prosecution claim is lack of probable cause. And here the trial court concluded that probable cause existed to arrest plaintiff on a theory of constructive possession based on the following facts is that there was a large quantity of drugs found throughout the house in Plainview. No one at the residence took responsibility for the drugs. An appellant confirmed to Detective Samus that she resided at this residence. She wasn't just a visitor. She confirmed that she lived there. She confirmed that the record indicates that she confirmed that Detective Samus, when they pulled up, or when she pulled up, they asked whether they lived at this residence. That was confirmed. And at that point, she was arrested along with Eugene Petit. And it's very significant that an appellant did not appeal the trial court's holding with respect to probable cause to arrest plaintiff on a theory of constructive possession. And furthermore, none of the alleged false statements are materially related to the elements necessary to establish probable cause for constructive possession. For example, the reference to appellant as her juvenile daughter who was in possession of drugs at the time of the incident is immaterial. Constructive possession does not require appellant to be in possession of drugs at the time of the incident. Likewise, testimony that drugs were found throughout the house but not in appellant's bedroom is also immaterial. I was going to say, is that relevant to anything? No, certainly not to a constructive possession claim. Constructive possession does not require the presence of drugs in appellant's bedroom. And in this case, the facts show that the drugs were located in the kitchen, on top of a freezer, in the living room, in a bedroom upstairs. And they said it was throughout the house and in plain view. Also, testimony that appellant's husband was the owner or principal renter of the property is immaterial. Again, it was confirmed that appellant was living at this residence by Detective Samus. What about the testimony that she was a lookout and a seller of controlled substances? And that testimony, that is immaterial for purposes of establishing probable cause for constructive possession. She does not have to prove that she is selling drugs or that she was a lookout. It just doesn't require that element. And finally, the alleged testimony that appellant is married to her cousin has no bearing on any probable cause finding with respect to constructive possession. With the remainder of my time, I will address why a government official who testifies Yes, Your Honor. Just one question. Procedurally, what happened that led to the dismissal of the indictment? My understanding is that the indictment was dismissed and that appellant pled guilty to, I believe it was conspiracy for aggravated assault, which was unrelated to this incident. So she pled guilty to that and then they dismissed this charge. And she didn't retain her 1983 suit? That was dismissed too as part of this overall dismissal? I can't understand. I mean, she was in jail for six months. That's correct, Your Honor. On the drug possession charge? Yes. And then they came to an agreement? They pled it out in some way or other? That is correct. There was the indictment and then she was unable to postpone. She was incarcerated for approximately six months and then she pled guilty to the, I think it was conspiracy for aggravated assault. And then they dropped these charges. Under another set of facts? Yes, unrelated to this incident, correct. It really shows you that they can't make bail. Where was she incarcerated? Monmouth County? In a county jail. I believe it was in a county jail. In fact, it's a little unclear. I think appellant's counsel may know better, but I believe it was a county jail. And how much bail was called for? I'm not aware of that, Your Honor. Maybe he'll know. A government official who testifies before a grand jury is entitled to absolute immunity from civil damages based on his testimony. The Supreme Court has adopted a functional approach under which official witnesses at criminal trial are absolutely immune from civil damages based on their testimony. Do you represent the feds or the state? The Monmouth County Prosecutor's Office and Detective Samus. But you're with the state attorney. Yes, that is correct, Your Honor. In New Jersey, the state can come in. We represent the county prosecutor's office. Did you tell the feds about this case, that this was up here? I was interested. I am unaware of that. I apologize. That's all right. I was unrelated with this case until you. That's all right. I just wondered. In Williams and Colwicky, this court extended absolute immunity to pretrial proceedings and declined to interpret Malley as overriding the broad witness protection. I didn't hear what you just said. And declined to interpret Malley? To interpret Malley, yep, as overriding the broad witness protection that was announced in Briscoe. In Williams, this court expressly disagreed with other circuits that did not extend absolute immunity testimony before a grand jury and found that the considerations underlying absolute immunity at trial are fully applicable in the grand jury context. A grand jury witness who fears future litigation might be reluctant to come forward and testify. And also where a witness does testify. Is there a distinction between a complaining witness and the ordinary witness for purposes of immunity analysis? This court has rejected that distinction as well in Colwicky and determined that Briscoe did not make any such distinction. When you look at Briscoe and Malley, basically they reflect a fundamental distinction between accusations that are offered during a judicial proceeding which are subject to absolute immunity and accusations made to initiate such a proceeding as were the case with the affidavit, which are not. So under Malley, a person who initiates a prosecution may be liable for malicious prosecution regardless of whether they testified before a grand jury or at trial. Is there any history that you know of as to whether people who give knowing false testimony ever get indicted for perjury? Well, that certainly is one of the safeguards that is built into the system and why absolute immunity is appropriate here and that qualified immunity is not. Anything less than absolute immunity is not necessary in order to deter this conduct because – Judge Pollack asked you a factual question because you're in the Attorney General's office. With respect to this particular case? No, with respect to any case. In general, do people get into trouble like going to prison for giving knowing false testimony, whether or not they are government officials? Yes, there is federal and state laws against perjury. Yeah, but do they go to – he's saying as a matter of fact, do they go to jail? Do people get charged? I personally have not been involved in that type of a case. I've presided over perjury trials involving grand jury testimony, but not as complaining witnesses, somebody else who's called before the grand jury. A complaining witness exception would require the trial court to determine whether a particular witness's testimony could be said to have been the primary cause for the grand jury decision to indict. By its nature, such a determination is speculative, absent testimony from the grand jurors themselves. For example, in this case, it would be necessary to determine whether the grand jury indicted because, one, there was a large quantity of drugs in the residence, no one at the residence took responsibility for the drugs, an appellant confirmed that she resided at the residence, or, on the other hand, did the grand jury indict because of one or more of the alleged false testimony. Such a determination is imprecise without testimony from the grand jurors, and such testimony would completely undermine the secrecy that grand jury proceedings have historically been accorded. A rule of absolute immunity for grand jury testimony eliminates the need for courts to probe the decision-making processes of the grand jury and eliminates the risk that witnesses will shade their testimony for fear of any monetary liability. Unless the court has any further questions. What? Oh, go ahead. No, that's fine. Thank you. Thank you. We'll hear the rebuttal, and then we'll make a comment. Thank you. Okay. I'll make a comment. You may, too, if you want. I think it would be helpful if I just answered some of the questions that my adversary is unfamiliar with. Answer whatever. Sure. Tell us what we need to know. Sure, sure. Ms. Petit was incarcerated in Monmouth County Correctional Institute and in freehold for approximately six months. What was the bail? The bail was $75,000, no 10%. So that means if she had $7,500, she would have been out. Right, but she didn't. $7,500 for a mother of four that's, you know, on welfare is not easy to do. And then without getting too much into it, the aggravated assault was totally unrelated. And I think, you know, what you may have been thinking is, well, wasn't she represented by a public defender or something like that when the deal was made? And she was. But there is no, we have no evidence, no information that she acknowledged probable cause. And certainly there was plenty of opportunity to provide that to us. So it's not like she waived. You're representing her personally? You're not, I mean, from an age, from the defenders or anything like that? I'm not a hired gun. She was my client from the get-go. I'm sorry, was there another question? No, no. Okay. Do you know what happened on the aggravated assault charge? The specifics? Yeah, in terms of? The sentence. The sentence, yeah. Well, the sentence on the aggravated assault. My understanding is that the drug charges were administratively dismissed. And I don't know if it was a quid. I don't think it was. Was time served? Yeah. I'm not, I can't comment. I wasn't her attorney on that, on that matter. Okay. That's what we wanted to know. But just in the way of background, the target of the drug investigation, it was Ms. Petit's sister-in-law, Ebony Petit, who was under investigation for several months by the Monmouth County Prosecutor's Office. Not the aunt? Not the aunt. She's the owner of the house, Georgina Tyler. She was in her 80s. And she's the one that gave the consent to search the house. Separately, Ebony Petit is my client's sister-in-law, who as a drug kingpin would go from place to place. And that day she happened to be queen. Yes, thank you. I apologize. But that said, I'm sorry, Judge, just before I forget, the issue about a guest. Counsel is correct that she lived there, but she was a guest of her aunt. She was not a renter. She was not an owner. That's the distinction. I'm not trying to misrepresent. She lived there. She had a room there, but she was not a primary. You said that the indictment was administratively dismissed. That was the phrase I heard. The drug charges were administratively dismissed. What does an administrative dismissal mean? An administrative dismissal means she spent six months in jail. Oh, no. Yep. Who has the authority to administratively dismiss? I believe it's the Monmouth County Prosecutor's Office. I believe it's the Monmouth County Prosecutor's Office that dismissed the charges. Boy, it gives us a slice of life, doesn't it? Yeah, yeah. Does a prosecutor have to go to a court and say, I'd like to have these charges dismissed? I don't think so. I think they have a lot of discretion. With these kinds of cases, I believe so. You know, that said, the other thing is that Ebony Petit, the target, she's spending hard time in jail in New Jersey. So, you know, as far as constructive possession goes, maybe at the time of the arrest nobody copped to it. But Ebony Petit, the clean pin, she pled guilty to owning and distributing and she's serving, I think, a 15-year sentence. That's still a state con, not a federal. All the officers involved, as I know it, were state police, you know, local police. I'm sure that there was the DEA or the FBI was probably notified about it, but it was essentially a state prosecution. I mean, it was a state prosecution. Well, what's the constitutional right that's implicated by the alleged false testimony to the grand jury? Well, I mean, thank you, Judge. The 1983 claim is essentially, you know, if I had to do over again, I may have clarified some things like knowingly false and 1983 malicious prosecution. But I think 1983 is very broad. So I don't know that you necessarily need to put malicious prosecution in there. It's kind of implied that 1983. Was it a Fourth Amendment interest that's implicated here or, you know, it's got to be a constitutional right? What's the Fourth Amendment against unreasonable searches and seizures? What's the constitutional interest? Yeah, yeah, yeah, yeah. I'd say that's part of it. Okay. And it's, you know, it's an old 1871 and new developing area of the law. So, you know, I'm curious also to see how the Supreme Court rules. Thank you. That's my time. Thank you very much. Okay. That gets me right. That segues beautifully into my comment, which is what we'll do is when the Supreme Court decision is out, and my guess is we'll find out. Maybe faster than you people found out. It was pending. We will ask you to comment on the effect of the decision on the facts of this case, what's before us in this case. And retrospectively, I think it was good for us to come here. You know, I'm glad to get it off my chest. Thank you. We learned some things. We did. We did. Yeah, thank you. Thank you very much. Thanks. Thank you.